ARTHUR W. AND ANN R. NASH RHODES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ARTHUR W. RHODES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rhodes v. Commissioner
Docket Nos. 32852-85, 23567-88
United States Tax Court
T.C. Memo 1994-321; 1994 Tax Ct. Memo LEXIS 330; 68 T.C.M. (CCH) 79; July 14, 1994, Filed *330 Decisions will be entered under Rule 155. For petitioners: Ross Alan Rhodes, in docket Nos. 32852-85 and 23567-88. John A. Garraty, Jr., in docket No. 32852-85. For respondent: Pamela S. Wilson and Rajiv Madan. DAWSON, PANUTHOS DAWSON; PANUTHOS
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Chief Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181 and 183. [1] The Court agrees with and adopts the opinion of the Chief Special Trial Judge which is set forth below. OPINION OF THE CHIEF SPECIAL TRIAL JUDGE PANUTHOS, Chief Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and increased interest as follows: Docket No. 32852-85
Increased Interest
Petitioner
Year
Deficiency
Sec. 6621(c)
Arthur W. Rhodes
1978
$ 30,590
[1]
Arthur W. Rhodes
1979
8,589
[1]
Arthur W. and Ann R. Rhodes
1981
5,392
[1]
*331 Docket No. 23567-88
Additions to Tax
Sec.
Sec. Sec. Sec.
Petitioner Year
Deficiency 6651
6653(a)(1) 6653(a)(2) 6661
Arthur W.
Rhodes
1982
$ 10,163
$ 530.25
$ 508.50
[2]
$ 1,457
After concessions, [2] the remaining issues for decision are: 1. Whether petitioners are entitled to deductions, losses, and credits claimed with respect to a purported investment in a music master recording leasing transaction; 2. whether a particular master recording is property which qualifies for an investment tax credit; 3. whether petitioners are liable for increased interest pursuant to section 6621(c) for the years 1978, 1979, and 1981; and 4. whether the statute of limitations bars the assessment and collection of deficiencies and additions to tax with respect to the 1979, 1979, and 1981 taxable years. *332 FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein. At the time the petition was filed, petitioners resided at Darien, Connecticut. Audio Leasing Corporation [3] (hereinafter ALC) was a New Hampshire corporation established in 1980 which claimed to provide financing for the music, entertainment, and communications industry by acquiring audio masters and communications masters for lease. An audio master (master) is a tape or other medium upon which a specific performance or program has been electronically recorded and from which copies of the performance or program can be made for commercial use. If the master is multitrack, it is generally mixed and balanced and then made available for commercial use. In the instant case, the master in issue was recorded onto a record album for purposes of distribution. *333 Generally, ALC would acquire a master from a seller. ALC would lease to investors the rights to distribute copies of the master worldwide for a period of 7-1/2 years. At the end of the lease period, all rights in the master reverted back to ALC. In the promotional material provided by ALC, there is some discussion concerning the opportunities and markets for potential distribution of the master recording. There is a brief discussion concerning the economics of the investments. In addition, there is a discussion concerning the tax incentives associated with such an investment. This includes a tax opinion authored by the law firm of Mirre, Ryan & Ross and a full-page chart. According to the chart, a lessee would receive tax benefits in excess of the amount of cash paid. The promotional material indicates that investors were eligible for an investment tax credit (ITC) based upon the purchase price of the master recording. In addition, the material indicates that investors could claim a deduction for expenses associated with the investment in the master recording including lease payments and distribution costs. The promotional material indicates that much of the financing for *334 the master recording would be through a note payable in 12 years. A copy of the note in the material bears the notation "recourse promissory note" and refers to a certain purchase agreement between the buyer (ALC) and seller. A discussion of the purchase agreement in the material reveals that the note is secured by a first interest in the master recording and the credit of ALC. ALC purportedly acquired a master recording of the group The Yardbirds titled "For Your Love". The record does not reflect how, when, from whom, or for how much the recording was purchased. The record does contain a document titled Investment Incentive Tax Credit Lessor's Election Statement which reflects the fair market value of the master recording as $ 400,000, and indicates that ALC agreed to pass through to petitioners the ITC available from the investment in the recording. No specific documentation explains how ALC and the purported seller arrived at the fair market value of the master recording. The offering material indicates that the value of the master recording is independently determined by industry experts experienced in product acquisition and market expectations. Prior to his investment, *335 petitioner Arthur W. Rhodes (hereinafter referred to as petitioner) did not seek to ascertain any of this information. Petitioner learned of the investment opportunities in music master recordings through an acquaintance in 1980. Petitioner later met with representatives of ALC and Accord Record Corp. (Accord). Upon the advice of these representatives and the information presented in the promotional brochures, petitioner invested in ALC. On June 18, 1981, petitioner entered into a lease agreement with ALC. According to the terms of the lease, petitioner purchased the rights to distribute the master recording of The Yardbirds' "For Your Love" for 7-1/2 years. The lease prohibited petitioner from altering the master in any way, unless permission was granted by ALC. The promotional material explaining the conflict of interest that may have arisen in this leasing indicates that ALC will lease master recordings of the same artist to other investors. In exchange for the lease rights, petitioner was obligated to make payment of $ 24,000 and 50 percent of net revenues he received from revenue-producing ventures involving the master recording payable every 6 months. Petitioner was *336 obligated to pay 80 percent of the $ 24,000 in the first year, with the remaining 20 percent amortized over 6-1/2 years and payable on a semiannual basis. Petitioner paid ALC $ 12,000 in cash and signed a promissory note in the amount of $ 12,000. On June 18, 1981, petitioner entered into a distribution agreement with Accord. Accord was hired to distribute copies of The Yardbirds' "For Your Love" master recording. Petitioner was to pay Accord $ 5,000 plus 60 percent of gross receipts from sales and 50 percent of any public performance fees received by petitioner with respect to the master recording. Petitioner was to receive from Accord 40 percent of any gross receipts. In exchange, Accord agreed to distribute, at a minimum, 5,000 records. Accord was one of the record labels financed by ALC or its parent corporation for purposes of distribution. ALC disclosed this relationship in its promotional material. In 1984, Indigo Music Corp. purchased Accord. Petitioner's master recording was included in this buyout. Indigo Music Corp. was unsuccessful in distributing petitioner's product. At the time of his investment, petitioner was a consultant in the field of energy. Prior *337 to his investment, petitioner was employed as an engineer by Union Carbide, Inc. Among petitioner's responsibilities at Union Carbide, Inc., was the purchasing and/or leasing of equipment for use at the company. This did not include the purchasing or leasing of master recordings. Petitioner received an undergraduate degree from the United States Naval Academy and a graduate degree in corporate finance from New York University. Petitioner did not seek the advice of an independent financial adviser, attorney, or accountant prior to the investment. Petitioner also did not obtain an independent appraisal of the master recording prior to the investment. Petitioner presented a marketing report of The Yardbirds purportedly authored by Professor Richard Broderick (Broderick) of New York University, who at the time was also working as a consultant for the firm MCIII, which ALC had hired. The report, which was sent to petitioner on February 7, 1982, does not provide an evaluation of the particular master recording. Broderick did not testify at trial. Petitioner presented Gregory Russo (Russo) as his expert witness at trial with respect to the master recording. Respondent presented *338 the report and testimony of Jack Weidenmann (Weidenmann). Weidenmann has several years of experience in the music industry. He was also an employee of MCIII and, through his employment, worked with ALC. According to Weidenmann, the fair market value of the master recording is $ 2,500. Weidenmann's evaluation took into consideration the recording and packaging of the album, as well as its marketability. Petitioner proffered a handwritten, undated, one-page document which contains his income forecast from this investment. According to the document, petitioner expected to achieve net revenue in the amount of $ 660,400. Included in this forecast were sales in Germany and Australia. In December 1981, petitioner received a check from ALC in the amount of $ 6,400. An explanation sent with the check indicates that the dollar amount was petitioner's 40-percent share of the sales of the "For Your Love" album. Petitioner received no further payment with respect to the master recording. On the Schedule C attached to their jointly filed 1981 Federal income tax return, petitioners reported income from sales of the master recording in the amount of $ 6,400 and claimed deductions in the *339 amount of $ 15,025 and a corresponding loss in the amount of $ 8,625. On a Form 3468, Computation of Investment Credit, attached to the 1981 return, petitioners claimed an ITC in the amount of $ 40,000, using a portion of the ITC to offset their 1981 tax liability and carrying back the remainder to offset petitioners' tax liability for the years 1978, 1979, and 1980. [4] As a result of this carryback, petitioner filed an application for tentative refunds in the amounts of $ 27,545.35, $ 8,589, and $ 2,529.65, respectively. On the Schedule C attached to his 1982 Federal income tax return, in which he claimed married filing separate status, petitioner claimed deductions with respect to the investment in the master recording in the amount of $ 11,666 and a corresponding loss in the amount of $ 11,173. [5]
*340 Petitioners executed a Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, on April 15, 1982. Respondent approved the request, and petitioners were entitled to a 2-month extension (until June 15, 1982) for filing their 1981 Federal income tax return. The copy of the return in the record reflects that the return was signed by petitioner on April 25, 1982. The copy also bears a stamp from the Internal Revenue Service (IRS) Andover Service Center which reflects that the return was received on June 1, 1982. Petitioner claims that he mailed the return on or about April 27, 1982. The notices of deficiency for the taxable years 1978, 1979, and 1981 were issued by respondent on May 31, 1985. OPINION Procedural Issues
Before proceeding with a discussion of petitioner's investment activities, we will discuss the statute of limitations issues raised by petitioners. Petitioners argue that the statute of limitations bars respondent from assessing any deficiencies in and additions to tax for the years 1978, 1979, and 1981. A statute of limitations allegation is an affirmative defense, and the party making the allegation (petitioners) *341 bears the burden of proof. Rule 142(a); Coleman v. Commissioner, 94 T.C. 82, 89 (1990); Adler v. Commissioner, 85 T.C. 535, 540 (1985). Section 6501(a) provides (with certain exceptions not applicable here) that the amount of any income tax must be assessed within 3 years after the taxpayer filed his tax return. A return is generally "deemed" filed when it is physically delivered to that office of the Commissioner where the return is due to be filed. Hotel Equities Corp. v. Commissioner, 546 F.2d 725 (7th Cir. 1976), affg. 65 T.C. 528 (1975); Pace Oil Co. v. Commissioner, 73 T.C. 249, 251 (1979). [6]
*342 Petitioner nevertheless argues that the mailing date was April 27, 1982, in an attempt to establish that the stamped received date by the IRS of June 1, 1982, is incorrect. The IRS stamp on the return indicating the date of receipt is presumed to be correct, and petitioner must overcome that presumption with satisfactory evidence. Wedemeyer v. Commissioner, T.C. Memo. 1990-324, affd. without published opinion 959 F.2d 243 (9th Cir. 1992). We find petitioner's assertion that he mailed the 1981 return on or about April 27, 1982, to be unreliable. He claims he remembered the date of mailing because he had to bring the return to his wife to obtain her signature. However, the copy of the return in the record does not bear a signature of the wife, and petitioner did not present a copy of the return which bore her signature. Furthermore, petitioner's testimony contradicted a statement made in the petition and on the Form 1045. In the petition, the date provided for the mailing of the 1982 tax return was "May 15, 1982". On the Form 1045, the date provided for the mailing was "May 1982" [7] Petitioners have not furnished the *343 Court with a registered or certified mail receipt or other evidence to verify the mailing of the return on April 27, 1982, which might lead us to conclude that the stamped received date of June 1, 1982, is not accurate. Petitioner argues that respondent purposely destroyed the envelope which contained the return and which would establish the earlier mailing date; therefore, petitioner is entitled to the presumption that the envelope would reflect a mailing date well before June 1, 1982, citing Andrew Crispo Gallery, Inc. v. Commissioner, 16 F.3d 1336 (2d Cir. 1994), affg. in part, vacating in part, and remanding T.C. Memo. 1992-106. *344 Petitioner's argument is without merit. [8] There is no evidence in the record to indicate that respondent deliberately destroyed the envelope. Furthermore, in order for petitioner to be entitled to such a presumption, he must at a minimum offer credible evidence that the envelope would have borne a postmark reflecting that earlier date, which he failed to do. See id. at 1356.
Based upon the foregoing, we deem, for purposes of calculating the limitations period, that the *345 1981 return was filed June 1, 1982, the date of receipt by the appropriate IRS Service Center. Accordingly, we hold that the notice of deficiency for the taxable year 1981 was timely issued on May 31, 1985, and that respondent is not barred by the statute of limitations from assessing a deficiency in and additions to tax for that year. Petitioner made a similar statute of limitations argument with respect to the 1978 and 1979 taxable years. That argument is also without merit. As stated earlier, section 6501(a) provides generally for a 3-year period for assessment of a tax deficiency. The 3-year period begins to run as of the due date for the filing of the return. Sec. 6501(a). Assuming the returns for 1978 and 1979 were each filed on April 15 of the following year, [9] the 3-year periods for assessment of the taxes for those years expired on April 15, 1982, and April 15, 1983, respectively. Sec. 6072. The notices of deficiency for those years were issued on May 31, 1985. However, section 6501(j)(1) provides: In the case of a deficiency attributable to the [applications] to the taxpayer of a credit carryback * * * such deficiency may be assessed at any time before the *346 expiration of the period within which a deficiency for the taxable year of the unused credit which [resulted] in such [a] carryback may be assessed, or with respect to any portion of a credit carryback from a taxable year attributable to * * * other credit [carrybacks] from a subsequent taxable year, at any time before the expiration of the period within which * * * [the] deficiency for such subsequent taxable year may be assessed.[10]
In the instant cases, the unused portion of the ITC was generated in the taxable year 1981. The determinations in the notices of deficiency for the taxable years 1978 and 1979 result from petitioner's application of the unused portion of *347 the 1981 ITC in those years. As previously indicated, the notice of deficiency for the taxable year 1981 was timely issued. We hold that the determinations made for the taxable years 1978 and 1979 were timely made pursuant to section 6501(a), and that respondent is not barred from assessing any deficiencies in and additions to tax for those years. See Herman Bennett Co. v. Commissioner, 65 T.C. 506 (1975); Vest v. Commissioner, T.C. Memo. 1993-243. Substantive Issues
Respondent's primary argument is that petitioners are not entitled to the deductions, losses, and credits claimed in connection with petitioner's investment in the master recording. Respondent maintains that the transaction lacked economic substance and has no business purposes other than the creation of income tax losses and credits. The IRS may ignore for income tax purposes a sham transaction. Hines v. United States, 912 F.2d 736, 739 (4th Cir. 1990). A sham transaction is one without economic substance designed to create tax benefits rather than serve a legitimate business purpose. Id. (citing Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978)); *348 Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 195-196 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). Petitioners bear the burden of proving entitlement to the claimed deductions and credits. Rule 142(a); Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943); Hunt v. Commissioner, T.C. Memo. 1989-660, affd. 938 F.2d 466 (4th Cir. 1991). This Court and several Courts of Appeals, including the circuit to which appeal in this case lies, have applied a two-pronged test to determine whether a transaction is a sham. Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Rice's Toyota World, Inc. v. Commissioner, supra.[11]
*349 The first prong of the test (the subjective prong) is whether the taxpayer was motivated by a business purpose other than obtaining tax benefits in entering into the transaction. The second prong of the test (the objective prong) is whether the transaction has economic substance. Rice's Toyota World v. Commissioner, 752 F.2d at 91. Whether under this test a particular transaction is considered a sham is an issue of fact. Id. at 92. The business purpose inquiry looks to the motive of the taxpayer in entering the transaction. We look to the structure of the investment, drawing from the objective facts inferences regarding a subjective intent to profit. Hunt v. Commissioner, 938 F.2d at 472. We first focus on the promotional material. There is little emphasis placed upon the profit potential of a master recording and the means by which a profit could be achieved. Rather, the material explains in much greater detail the availability of a tax benefit through both the ITC and the deductibility of lease payments and distribution costs. The evidence presented by petitioner concerning the *350 research he conducted prior to investing also fails to establish the requisite profit motive. While petitioner may have gained some experience in the nuances of leasing in his prior employment, petitioner had no experience leasing master recordings in the music industry. Petitioner claimed that he researched the industry, and in particular ALC, through various music trade magazines and through the promotional material provided by ALC. In addition, petitioner claimed that he sought the advice of several individuals knowledgeable in this area. We find petitioner's action prior to investment to be insufficient. Much of the material relied upon consisted of excerpts from ALC's own promotional brochures. Furthermore, many of the individuals relied upon by petitioner were affiliated with ALC and, therefore, any "advice" rendered is suspect. Petitioner testified at trial that he did not enlist the services of any independent attorney or accountant for purposes of assessing the economic viability of the investment or for that matter the legitimacy of ALC and its representatives. Petitioner did testify that he sought the advice of a financial consultant named Carl Savio; however, petitioner *351 failed to present any corroborating evidence to support his assertion. Petitioner also failed to exhibit a true profit motive with respect to his negotiations with ALC. Petitioner appeared to have no knowledge of the manner in which the purchase price and the fair market value of the master recording were computed. Despite this lack of vital information, petitioner did not acquire an independent appraisal of the master recording and instead relied upon the report prepared by Broderick. Failure to acquire an appraisal or reliance solely on an appraisal furnished by the seller of an investment is indicative of an indifference to economic profit. See Beck v. Commissioner, 85 T.C. 557, 572 (1985). Furthermore, the document which petitioner claimed to be the appraisal was nothing more than an article about The Yardbirds written by an individual affiliated with ALC, which in fact was mailed to petitioner well after he had invested. The report contains no substantive evaluation of the "For Your Love" master recording. [12]
*352 There is also no indication that petitioner negotiated the price and terms of the lease and the initial distribution agreement with Accord. [13] Petitioner claimed that he negotiated the interest rate to be applied to a promissory note he signed with ALC; however, no documentation was presented to support his testimony. Furthermore, petitioner claims that he negotiated one of the terms in the distribution agreement. According to petitioner, Accord's obligation to distribute was extended worldwide pursuant to his demands. However, to support this claim, petitioner relied upon a letter from Accord addressed to petitioner which indicated that the terms of the distribution agreement "inadvertently" contained a definition of the territory for distribution as the United States rather than the world. This hardly is evidence that petitioner negotiated this provision in the lease. *353 Petitioner, in an attempt to establish a profit motive, referred several times to the document which he claimed forecasted his income from the investment. The information reflected on the document exemplified the unrealistic nature of this investment. Petitioner expected revenues from sales of "For Your Love" to reach $ 664,000. At trial, petitioner explained that this figure was based upon sales of 1 million albums. However, Russo, petitioner's witness, explained that none of The Yardbird's musical performances reached sales of 1 million. Russo also testified that, according to the terms of this lease, between 5,000 and 10,000 albums were to be sold in the first year of the lease, with the amount of sales declining over the remaining portion of the lease. It appears virtually impossible that sales of "For Your Love" could approach the 1 million figure. [14]
*354 Petitioner also referred to the fact that he had received a check from ALC in the amount of $ 6,400, claiming that the money was his percentage of sales of the "For Your Love" album. We are skeptical as to the origin of the payment; in particular, the fact that the payment was received from ALC rather than from Accord, as indicated in the distribution agreement. There is nothing contained in the terms of the lease agreement between ALC and petitioner which indicated ALC was to make payments to petitioner. Furthermore, the terms of the lease agreement required petitioner to pay ALC 50 percent of any gross receipts generated from sales of the "For Your Love" album. Petitioner did not present any information to establish that such payment was made on the purported sales of the album. Petitioner's response to respondent's inquiry concerning the origin of the payment was inconclusive. Based upon the foregoing, we find that petitioner failed to establish that he possessed the requisite profit motive with respect to his investment in the master recording. The second prong of the test to determine whether a sham transaction exists is the economic substance inquiry. For this we look *355 to see whether, aside from the tax benefits, the lease afforded petitioner no reasonable possibility for profit. One area of concern in a case such as this is whether the purchase price purportedly paid by ALC for the master recording bears a relationship to the fair market value of the recording. Weidenmann, respondent's expert, valued the master recording at $ 2,500. His evaluation was based upon, among other things, the fact that several tax shelters were offering investment opportunities in numerous versions of recordings being offered by ALC and that a major record company was attempting to market any of The Yardbird's recordings that were still in demand, all of which significantly reduced the marketability of the master recording in issue. Weidenmann also noted that the album cover misrepresented important information concerning the history of the group which would most likely deter some individuals from purchasing the album. Petitioner failed to present any reliable evidence with respect to the appraisal of the master recording. We accept the valuation of the master as provided by respondent's expert and find that there was no relationship between the purchase price *356 of the master and its corresponding fair market value. [15]
In conjunction with the disparity between the purchase price and the fair market value is the fact that there was no indication that ALC and the seller of the recording engaged in arm's-length negotiations with respect to the purchase price. In fact, the record is devoid of any reliable evidence on this issue, despite inquiry by respondent. The absence of arm's-length negotiations is a key indicator that a transaction lacks economic substance. Rose v. Commissioner, 88 T.C. 386, 416 (1987), *357 affd. 868 F.2d 851 (6th Cir. 1989). The next area of concern is the manner in which the sale of the recording was structured. A sale financed by deferred debt which, in substance or fact, is not likely to be paid is an indicium of a lack of economic substance. Hunt v. Commissioner, T.C. Memo. 1989-660 (citing Rose v. Commissioner, supra at 419), affd. 938 F.2d 466 (4th Cir. 1991). For this we will focus on the substance rather than the form of the debt. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988). The record does not contain any documentation bearing on the specific method by which ALC purportedly purchased the master recording from the seller, including any amount of cash expended. However, the promotional material appeared to outline the method of purchase employed by ALC. [16] Most of the purchase price was to be financed by a note. The sample note in the material was titled "recourse promissory note"; however, it is apparent that the note is only recourse in form and in substance is truly *358 nonrecourse. According to its terms, ALC would not be obligated to make payment on the note for 12 years. The only security to be pledged by ALC was a first interest in the master recording and the credit of ALC. There is no real financial obligation which would deter ALC from abandoning the outstanding debt once the investment lost its attractiveness. The type of note most likely employed by ALC in this investment would not reflect an honest obligation for repayment of debt, but rather would be a tool utilized by ALC to artificially inflate the value of the master recording so as to increase the amount of ITC available in the hope of enticing investors. While petitioner was not directly involved in the structuring of this level of financing, the financing undoubtedly played an integral part in the investment relationship between ALC and petitioner. The availability *359 of an ITC was strongly emphasized by ALC and the larger the "purchase price" of the master recording, the larger the amount of the ITC which could be passed through to the investor. Finally, the terms of the lease agreement granted petitioner nothing more than a nonexclusive right to distribute the songs contained on the master recording. By preventing petitioner from altering the master recording, ALC would have been able to present the same selection of songs contained on the master, but in a different sequence, to other investors. Potential investors were advised of this risk in the promotional material. Because ALC fostered such close competition, it is virtually impossible to envisage any profit potential arising from this investment. Based on the foregoing analysis, we hold that petitioner's investment in the master recording is devoid of any economic substance and was entered into solely for the income tax benefits. On this basis, the investment is to be disregarded for Federal income tax purposes. Accordingly, petitioners are not entitled to any deductions or credits claimed in connection with such a transaction. Because of our conclusions, we need not address whether *360 the master recording is property which qualifies for investment tax credit treatment. Additions to Tax and Increased Interest
Respondent determined that, for the taxable year 1982, petitioner was liable for the additions to tax for negligence, valuation overstatement, and substantial understatement. Petitioner agreed that if this Court concluded that a deficiency resulted in 1982 from his investment in the master recording, he would be liable for the additions to tax with the understanding that the section 6661 addition to tax would apply only if the underpayment exceeded $ 5,000. Having concluded that petitioner's investment resulted in a deficiency, we hold that petitioner is liable for all of the additions to tax, except with respect to the substantial understatement. In order to determine whether petitioner is liable for this addition to tax, it first must be determined whether the understatement attributable to the investment exceeds $ 5,000. This matter will be resolved in the Rule 155 proceedings. Respondent determined that the deficiencies for the taxable years 1978, 1979, and 1981 are subject to the increased interest imposed pursuant to section 6621(c). Section *361 6621(c)(1) imposes an increased rate of interest when there is a substantial underpayment attributable to a "tax motivated transaction". Congress specifically amended section 6621(c)(3)(A) in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1353(a), 100 Stat. 2085, 2750, to add to the list of tax-motivated transactions "any sham or fraudulent transaction". Sec. 6621(c)(3)(A)(v). This Court has interpreted section 6621(c)(3)(A)(v) to include transactions without economic substance. Patin v. Commissioner, 88 T.C. 1086, 1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). For purposes of section 6621(c), an underpayment exceeding $ 1,000 is substantial. The additional interest accrues after December 31, 1984, even if the transaction was entered into prior to the enactment of section *362 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The underpayment of tax for the years 1978, 1979, and 1981 exceeds $ 1,000; therefore, for purposes of section 6621(c), it is substantial. We concluded that the leasing transaction lacked economic substance and constituted a sham. Therefore, it is tax motivated for purposes of section 6621(c). Accordingly, we hold that petitioners are liable for the increased interest rate imposed under section 6621(c) on the deficiencies for the tax years 1978, 1979, and 1981 to the extent that the understatements resulted from such tax-motivated transaction. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to a tax- motivated transaction.↩
2. 50 percent of the interest due on the deficiency.↩
2. With respect to the deficiency for 1981, petitioners do not contest that portion of the deficiency attributable to the inclusion of dividend and interest income in the amount of $ 1,353. With respect to 1982, a stipulation of settled issues resolves most of the issues. The remaining issues in dispute for 1982 concern petitioner Arthur W. Rhodes' investment in a master recording leasing transaction. Petitioner Arthur W. Rhodes concedes the additions to tax if, upon our resolution of the leasing transaction issue, we find that there is a deficiency in income tax. The one limitation on this concession is that sec. 6661 is to be imposed only if the underpayment exceeds $ 5,000.↩
3. Audio Leasing Corp., a subsidiary of Audio International Productions, Ltd., changed its name in 1984 to Aurovision.↩
4. The taxable year 1980 is not at issue in these cases.↩
5. Petitioner indicated on brief that total deductions claimed on the Schedule C should be $ 11,646, rather than the $ 11,666 as reflected on the schedule. Accordingly, the amount of loss claimed is reduced from $ 11,173 to $ 11,153 as well.↩
6. Sec. 7502 provides that the U.S. postmark date on the envelope in which the return was mailed is deemed the delivery date. However, sec. 7502 applies where the postmark date is on or before the due date for filing (or any extension granted) and the return is received after the due date. Pace Oil Co. v. Commissioner, 73 T.C. 249↩ (1979).
7. Petitioner argues that the Form 1045, which reflects that petitioner signed the form on May 15, 1982, proves that the 1981 return was filed at least before May 15, 1982. We do not agree. Although the Form 1045 indicates that it was signed on May 15, 1982, nothing in the record reflects that petitioner mailed the form on that date.↩
8. We note that in Andrew Crispo Gallery, Inc. v. Commissioner, 16 F.3d 1336 (2d Cir. 1994), affg. in part, vacating in part, and remanding T.C. Memo. 1992-106↩, the Government subpoenaed and then lost some of the taxpayer's records, including a ledger account, listing the cost and disposition of all works in the taxpayer's inventory, whereas here what was lost or destroyed was not a comparable record maintained by petitioner but an envelope in which he mailed his tax return to the IRS.
9. Petitioner has given no indication that the returns were filed at a different date.↩
10. Petitioner does not fall within the provisions of sec. 6501(k) because the entire deficiency for 1978 and 1979 is attributable to the disallowance of the ITC carryback. See Suivski v. Commissioner, T.C. Memo. 1993-291↩.
11. The Tax Court has also applied a "generic tax shelter" test which involves much of the same analysis as that present in the two-pronged test. See, e.g., Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851↩ (6th Cir. 1989).
12. Petitioner attempted to introduce as an appraisal a report authored by Russo. The report was written in 1993 for purposes of this litigation. While we allowed the report and Russo's corresponding testimony into evidence for certain purposes, we did not accept the report for purposes of establishing the value of the master recording because of petitioner's failure to establish Russo's expertise in this area.↩
13. Despite the indication in the promotional material that an investor could choose the services of any distributor, petitioner chose to use Accord.↩
14. Although the Yardbirds' "For Your Love" may have sold a million records in earlier years, its heyday was over by 1981 when petitioner acquired rights to it. Consequently, the possibility of its revival was limited.↩
15. Petitioner's counsel objected to the use of Weidenmann as an expert. He was not satisfied with the techniques employed by Weidenmann for purposes of appraisal and with the fact that Weidenmann had a prior business relationship with ALC. Despite counsel's contentions, we accepted the report and testimony provided by Weidenmann. Weidenmann has testified in this Court on prior occasions, and we found his presentation in the instant case to be thorough and reliable.↩
16. This method has been utilized by ALC in several other music master leasing transactions which have been the subject of litigation before this Court.↩